IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.                                    Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff's Motion for New Trial under Fed. R.

Civ. P. 59(a) or, in the alternative, to Alter or Amend the District Court's Judgment under Fed.

R. Civ. P. 59(c) ("Motion" or "Mot." (ECF No. 87)), following a jury trial for this personal

injury case emanating from a traffic accident. During the trial, Defendant did not contest

liability or the traditional soft-tissue injuries that result from a car accident. However, Defendant

did challenge other internal injuries that Plaintiff asserted arose from the accident, namely

whether Plaintiff suffered a pelvic prolapse,[1] damage to her InterStim™ II ("InterStim" or

"InterStim device"),[2] or other injuries to her bladder, pelvis or uterus. During the trial, the jury

found that Plaintiff failed to meet her burden of proof as to the InterStim device and the Court

---

[1]    "When the muscles and ligaments supporting a woman's pelvic organs weaken, the pelvic organs can drop lower in the pelvis, creating a bulge in the vagina (prolapse)." *Pelvic organ prolapse: Overview*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pelvic-organ-prolapse/symptoms-causes/syc-20360557 (last visited January 26, 2023).

[2]    "The implanted InterStim™ II system electrically stimulates the sacral nerve, which is thought to normalize neural communication between the bladder and brain and between the bowel and brain." *InterStim™ II System: Overview*, Medtronic (February 2022), https://www.medtronic.com/us-en/healthcare-professionals/products/urology/sacral-neuromodulation-systems/InterStim-ii.html.

granted Defendant's motion under Rule 50(a)(1) of the Federal Rules of Civil Procedure as to the

pelvic prolapse, finding "an insufficient evidentiary basis for a reasonable jury to find for

Plaintiff on that issue[,]" because expert testimony was necessary to support such a verdict under

Virginia law.[3]  (ECF No. 80.)

   Plaintiff's Motion attacks the jury's verdict and the Court's granting of the Rule 50

motion.  However, in doing so, Plaintiff ignores the fundamental problem with her case:  her

---

[3]     In diversity cases, such as this case, federal courts must apply state substantive law in the
adjudication of state-created rights. *Szantay v. Beech Aircraft Corp.*, 349 F.2d 60, 63 (4th Cir.
1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Thus, "[w]hen sitting in diversity,
a federal court is obligated to apply the choice of law principles of the state in which it sits."
*AMEX Assur. Co. v. Giordano*, 925 F. Supp. 2d 733, 742 (D. Md. 2013) (citing *Klaxon Co. v.
Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). However, federal courts still apply federal
procedural rules based on:

> the underlying purpose of *Erie*:  to ensure that in cases where
> a federal court possesses jurisdiction solely on the basis of diversity, "the outcome
> of the litigation in the federal court should be substantially the same, so far as
> legal rules determine the outcome of a litigation, as it would be if tried in a State
> court."

*Structural Concrete Prods., LLC v. Clarendon Am. Ins. Co.*, 244 F.R.D. 317, 322 (E.D. Va.
2007) (quoting *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945)).

   The case at bar presents a blended substantive and procedural law question.  The
requirements of expert designation and preclusion of testimony following a failure to designate
an expert are governed by Federal Rules of Civil Procedure 26 and 37.  The definitions of lay
versus expert testimony, and the relevant parameters as a result, are governed by Federal Rules
of Evidence 701 and 702, respectively.  In contrast, whether or not an expert is required to
establish causation is governed not by federal law but instead by state substantive law which
establishes the underlying cause of action. *See, e.g., McCauley v. Purdue Pharma L.P.*, 331 F.
Supp. 2d 449, 461 (W.D. Va. 2004) (federal court in Virginia applying Virginia substantive law
when sitting in diversity over a products liability action).  Here, Plaintiff and Defendant do not
contest that Virginia substantive law governs the underlying action and determines whether
expert opinion testimony is required to establish causation.  (ECF No. 22 at 6 ("Plaintiff agrees
with Defendant that since the Court has this case as a matter of diversity jurisdiction, the Court
must apply Virginia substantive law.  Furthermore, the Plaintiff further agrees that the Court's
decision depends on the evidence and types of damages permitted in personal injury cases under
Virginia substantive law.").)

counsel mishandled the discovery process by failing to identify an expert witness to support her assertion that the injuries in dispute arose from the accident. And this error permeated the trial of this case, as it undermined Plaintiff's ability to establish causation as to the contested injuries. Despite her counsel's mishandling of discovery, Plaintiff asks the Court to grant a new trial, or in the alternative, amend or alter a judgment against her under Rules 59(a) and (e), respectively.

Specifically, pursuant to Rule 59(a), Plaintiff seeks to set aside the jury's verdict and retry her case. Plaintiff argues that: (1) the Court erred during the first phase of the trial by allowing Defendant to refer to the amount of Plaintiff's claim during the liability phase, (2) by contradicting its prior rulings on Plaintiff's treating physician's testimony, and (3) questioning Plaintiff's witnesses during trial. Alternatively, pursuant to Rule 59(e), Plaintiff moves the Court to amend and reverse its grant of Defendant's Rule 50 motion, because the Court committed a clear error of law by ruling that Plaintiff failed to present sufficient evidence to establish causation as to Plaintiff's pelvic prolapse.

For the reasons that follow, the Court will DENY Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(e). (ECF No. 87.)

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a car accident involving Defendant and Plaintiff in Middlesex County, Virginia, on July 17, 2019. (ECF No. 57 at 1.) Defendant admitted that his negligence was the proximate cause of the accident and did not contest that Plaintiff sustained both soft tissue injuries and a head injury as a result. (*Id.*) However, Defendant challenged all other claimed injuries, including whether Plaintiff suffered a pelvic prolapse, damage to her InterStim device or any other injuries to her bladder, pelvis or uterus.

3

The Court bifurcated the trial into two phases. (ECF No. 25.) The first phase of the trial focused on whether Defendant's negligence caused the contested injuries. After the conclusion of Plaintiff's evidence, the Court granted Defendant's Rule 50(a) motion as to the alleged pelvic prolapse and other injuries asserted by Plaintiff involving her pelvic region, but allowed the jury to decide whether the accident damaged Plaintiff's InterStim device. (ECF No. 78.) The jury returned a verdict of "not proven" as to the InterStim device. (ECF No. 79.) The case then moved to the second phase of the trial, during which the parties addressed the appropriate amount of damages to be awarded to Plaintiff for the uncontested injuries. The jury awarded damages totaling $105,216 to Plaintiff. (ECF No. 82.)

### A.    Failure to Timely Identify Expert Witness as to Contested Injuries

Because Plaintiff's counsel's mismanagement of discovery lies at the heart of the issues raised in the current motion, the Court recounts in detail the procedural history of the case. The case was initially filed in the state system on June 3, 2021, but removed to this Court on October 26, 2021. (ECF No. 1.) Thereafter, Plaintiff retained the law firm of Geoff McDonald & Associates, P.C., specifically attorney Nikita Wolf, to represent her.   (ECF Nos. 4, 5.)

Following an initial pretrial conference, the Court set the case for trial to begin with jury selection on July 21, 2022, and issued a Scheduling and Pretrial Order, specifying deadlines for the case, including those for Rule 26 disclosures of witnesses and evidence.[4] (ECF No. 8.) On February 21, 2022, pursuant to the Scheduling and Pretrial Order, Plaintiff filed her Expert Designations, solely designating Dr. Teresa Camden as an expert witness, indicating that Dr.

---

[4]      On November 15, 2021, Plaintiff filed Plaintiff's Initial Rule 26(a)(1)(A) Disclosures, listing Plaintiff's current and prior treating physicians — including those at the Intimate Wellness Institute of Virginia — as individuals with potentially discoverable information, although Plaintiff listed no individuals by name. (ECF No. 6.)

Camden would testify regarding the treatment for the uncontested injuries. (ECF No. 10.)

Importantly, Plaintiff did not designate Dr. Nathan Guerette of the Intimate Wellness Institute of

Virginia as an expert, nor any other expert pertaining to the causation of the disputed injuries or

the damage to the InterStim device. (*Id.*) Generally, a treating physician need not be designated

as an expert and may testify as a lay witness to personal observations stemming from his course

of treatment of a plaintiff. *Springs ex rel. C.S. v. Waffle House, Inc.*, 2021 WL 119303, at *3

(D.S.C. Jan. 13, 2021). Some types of causation, however, require an expert designated to opine

on such issues, and almost all cases are strengthened by expert opinions on causation. *See, e.g.*,

*Sumner v. Smith*, 257 S.E.2d 825, 827 (Va. 1979) ("While failure or inability to adduce direct

medical evidence, generally relied upon to establish causal connection between injury and

accident, may significantly increase the plaintiff's risk of non-persuasion, such evidence is not a

prerequisite to recovery."). Plaintiff's failure to designate any expert on the issue of causation

for the challenged injuries lies at the heart of the instant motion.

On March 14, 2022, Plaintiff filed a Motion to Substitute Counsel, substituting Samantha

Cohn for Nikita Wolf as her counsel. (ECF No. 12.) Both attorneys worked at the same law

firm, Geoff McDonald & Associates, PC., and even though Ms. Cohn had not previously entered

her appearance, she had been working on the case with Ms. Wolf. (ECF No. 15 at 3.) The Court

granted the motion, substituting Ms. Cohn as counsel for Plaintiff. (ECF No. 13.)

On March 21, 2022, exactly one month after the deadline for Plaintiff's expert witness

disclosures, Ms. Cohn moved the Court to extend the deadline for expert disclosure. (ECF No.

14.) In particular, Plaintiff sought to designate Dr. Guerette as an expert. (*Id.*) Defendant

responded in opposition, noting that Plaintiff's failure to comply with Rule 26 was neither

justified nor harmless. (ECF No. 15 (citing Fed. R. Civ. P. 26(a)(2)(A).) Notably, this case

originated in the state system and remained pending there until removed to this Court on October 26, 2021 — more than two years after the accident. (ECF No. 1.)  Importantly, Defense counsel explained that he and Ms. Wolf had deposed Dr. Guerette on February 8, 2022, and Dr. Guerette testified that he could *not* opine to a reasonable degree of medical certainty that the contested injuries resulted from the car accident. (ECF No. 15 at 2.)  As such, Ms. Wolf had informed him that Plaintiff would not be seeking recovery for the contested injuries, which was confirmed thirteen days later when Plaintiff filed her expert witness notice identifying only Dr. Camden as a potential expert witness. (*Id.*)  Yet, after Ms. Cohn replaced Ms. Wolf, she sought to pursue the contested injuries despite Dr. Guerette's deposition testimony and Plaintiff's failure to identify Dr. Guerette (or any other expert as to the challenged injuries) in a timely manner.  The Court denied Plaintiff's motion on March 23, 2022, thereby precluding Plaintiff from relying on Dr. Guerette as an expert witness. (ECF No. 16.)  Plaintiff then moved to voluntarily dismiss her case, but later withdrew the motion. (ECF Nos. 17, 20.)

**B.  Defendant's Motion in Limine**

On March 28, 2022, Defendant filed his Motion in Limine to Exclude Dr. Nathan Guerette from Testifying at Trial, to Exclude Plaintiff's Medical Bills for Dr. Guerette's Treatment and to Exclude Any Mention of Any Condition Treated by Dr. Guerette ("MIL" (ECF No. 18)), as well as a Memorandum of Law in support of the motion (ECF No. 19).  Citing to Rule 37(c)(1) of the Federal Rules of Civil Procedure, Defendant correctly explained that when a party fails to properly identify an expert witness under Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).  In denying Plaintiff's motion to extend, the Court determined that Plaintiff's failure to comply with Rule 26 was neither

6

substantially justified or harmless, as the case was only months away from trial, and to allow

Plaintiff to amend her expert disclosures would have necessarily led to Defendant exploring

rebutting experts and likely a delay of the trial.  It bears noting here that Dr. Guerette was not

only known to Plaintiff's counsel before the expert witness disclosure deadline, he was actually

deposed by both sides (with Ms. Cohn being present) *thirteen days before the expert witness

disclosure deadline*.  (ECF No. 15 at 2.)

 Without expert testimony on the issue of causation pertaining to the contested injuries,

Defendant further argued that the Virginia Supreme Court's decision in *McMunn v. Tatum*, 379

S.E.2d 908 (Va. 1989), precluded Plaintiff from introducing evidence about the contested

injuries, because expert testimony was required to support a finding of causation and the medical

necessity of treatment for the disputed injuries.  (ECF No. 19 at 5–6.)  Specifically, Defendant

argued: "The causation of a complicated medical issue like a prolapse and bladder issues

certainly requires expert testimony as it is beyond the purview of a layperson.  In general, the

causation of a plaintiff's injury requires expert testimony." *Id.* (citing *Fitzgerald v. Manning*,

679 F.2d 341, 350 (4th Cir. 1982)).

 Plaintiff responded to the motion, conceding that "there are [sic] no expert designated by

either party" regarding the contested injuries.  (ECF No. 22 at 2.)  However, Plaintiff relied on

Dr. Guerette's observations as a treating physician, indicating that Dr. Guerette could testify that

"it is more likely than not that the car accident between the Defendant and Plaintiff on July 7,

2019 caused [Plaintiff]'s Interstim to malfunction as well as the prolapses and pelvic floor

dysfunction." (*Id.* at 3–4.)  Plaintiff submitted:

> In the instant matter Dr. Guerette is a treating physician who can qualify as an
> expert but will not be doing so as he is a treating physician of [Plaintiff] with
> firsthand participant knowledge who played a personal role in the diagnosis and
> treatment of [Plaintiff] and will only be asked the same.

(*Id.* at 5.) Plaintiff added that "Dr. Guerette will not offer any opinion testimony that would require him to be disclosed as an expert hybrid/fact witness under Rule 26(a)(2)(c)." (*Id.* at 6.)

Defendant replied, again asserting that expert testimony was needed to establish causation under the Virginia Supreme Court's decision in *McMunn*. (ECF No. 23 at 3.) Indeed, Defendant quoted *McMunn*:

> We now hold that where the defendant objects to the introduction of medical bills, indicating that the defendant's evidence will raise a substantial contest as to either the question of medical necessity or the question of causal relationship, the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship, or both, as appropriate.

(*Id.* (quoting *McMunn*, 379 S.E.2d at 914)). In short, in Defendant's view, *McMunn* commands expert testimony on the issue of causation, which Dr. Guerette could not offer in his capacity as only a treating physician.

The Court conducted a hearing on the motion on May 3, 2022. ("MIL Tr." (ECF No. 31).) The Court resolved the motion by bifurcating the case: Phase One would involve whether the car accident caused the contested injuries, while Phase Two focused on the damages resulting from the uncontested injuries, as well as those that the jury found that Plaintiff had proven during Phase One. (MIL Tr. 11:6–13:5.) During Phase One (the causation phase), Dr. Guerette would only be allowed to testify as a treating physician as to his factual observations about the change in Plaintiff's condition from when he last treated her in 2013 until he next saw her in October of 2019, indicating that her InterStim device was no longer functioning. (*Id.* 14:3–11.) However, Dr. Guerette could not opine as to *why* the InterStim device was not working when he saw her for the first time after the accident in October of 2019. (*Id.* 20:13–21.)

The Court gave specific examples of the parameters of his testimony. For example, the

Court explained that Dr. Guerette could testify, "I observed her and this was her condition,"[5] potentially establishing causation by inference. (*Id.* at 5:8–9.) However, Dr. Guerette could not testify as to *why* the device stopped working.[6] (*Id.* at 7:8–11, 10:4–21) In summary, the Court explicitly instructed Plaintiff that Dr. Guerette could testify (1) that he treated Plaintiff before the accident, (2) that Plaintiff did not require treatment for a period of years, (3) that Plaintiff came back to him after the accident and her InterStim device ceased working, and (4) that Plaintiff no longer felt well at that time. (*Id.* at 10:4–21.)

Additionally, Plaintiff and her partner could testify that they observed that the InterStim was working before the accident and then no longer functioned after the accident. (*Id.* at 5:23–6:8, 10:13–21, 14:5–11, 22:15–24:1.) Essentially, the Court determined that lay testimony could potentially establish causation in this case, but also cautioned Plaintiff's counsel that her case was "hanging by a gnat's eyelash."[7] (*Id.* at 13:22–14:1, 25:20.)

---

[5]     As an example, the Court said:

> [H]e could say "I'm looking at it and the device is not working." That's a factual thing. Now, he can't opine on what the cause is, okay? But [Plaintiff] can say that the factual difference is the only thing that caused the change was this accident.

(MIL Tr. 6:4–8.)

[6]     The Court reiterated time and time again leading up to trial that Dr. Guerette could merely testify as to observations that he witnessed, not causation. As a lay witness, he could testify as to what he observed: he "can only testify as to his observation and her need for treatment," "he can't opine that it was due to physical force." (FPTC 1 Tr. (ECF No. 56) 33:21–22, 34:7–8.)

[7]     Notably, when asked for her response to the Court's ruling, Plaintiff's counsel stated: "Can I put on the record that you're the smartest judge I've ever been in front of?" (MIL Tr. 21:23–24.) While this comment constitutes obvious hyperbole, it demonstrates Plaintiff's counsel's agreement with the Court's ruling as to the handling of Dr. Guerette's testimony following her discovery blunders.

9

After the hearing, the Court entered an Order laying out the parameters of its ruling. (ECF No. 25 at 2.)  The Court then further clarified the parameters of Dr. Guerette's testimony in a Memorandum Order issued on May 27, 2022, after Defendant filed a stipulation admitting to liability and indicating that he would not contest the soft tissue injuries that Plaintiff sustained to her head, neck and back.  (ECF No. 33.)  The Court explained:

> Again, Dr. Guerette may not provide expert testimony as to the cause of Plaintiff's injuries.  However, Dr. Guerette may testify as Plaintiff's treating physician in both phases of the trial.  During Phase One (addressing the issue of causation), Dr. Guerette may only provide testimony about his treatment of Plaintiff during the time period of 2011-13 and then the results of his examination when Plaintiff returned to him for treatment in October of 2019, including providing testimony on the functionality of the Interstim device before and after the accident at issue.  To reiterate, Dr. Guerette may not provide any expert testimony about the cause of any injuries that he observed when he examined and treated Plaintiff in October of 2019.

(*Id.* at 2.)

The Court understood two facts to be true when ruling in this fashion.  First, the ability to know whether the InterStim device was properly functioning consisted of simply looking at the device and seeing whether it was operating — essentially, looking at the "on/off" switch to see if it worked.  Second, that the pelvic prolapse arose from the damage to the InterStim device — that the pelvic prolapse directly resulted from the InterStim device not functioning after the accident.  Indeed, during the hearing on May 3, 2022, Plaintiff's counsel explicitly told the Court:  "The prolapse was never an issue prior to the accident." (MIL Tr. 24:8–9.)  This turned out not to be accurate.  Quite to the contrary, the trial testimony from Dr. Guerette established that Plaintiff's pelvic prolapse had no relationship with the functioning of the InterStim device and, instead, it constituted a progressive issue that began in 2011, well before the accident. (Trial Tr. (ECF No. 85) 117:25–120:23.)  Furthermore, the InterStim device was still operating when he examined her in October of 2019, but not functioning correctly.  (*Id.* 114:16–117:16.)

10

Moreover, the InterStim device does not treat prolapses. (*Id.* 125:24–25.) In other words, the functioning of the InterStim device had no relationship to the pelvic prolapse, which could only be described as a degenerative condition.[8]

### C.     The Final Pretrial Conference on July 12, 2022

The Court conducted a Final Pretrial Conference ("FPTC") for the case on July 12, 2022. Another discovery issue arose, as Plaintiff had failed to provide in discovery notice of any expert testimony about future damages. (FPTC 1 Tr. (ECF No. 56) 31:9–32:10.) Consequently, in an Order issued after the hearing, the Court barred Plaintiff from presenting any evidence of future damages, "because she did not adequately notify Defendant of evidence or expert testimony on this issue." (ECF No. 55.) Although this discovery violation has no impact on the issues raised in Plaintiff's motion, it again underscores the inherent defect in her case: Plaintiff's counsel continuously mishandled the discovery process.

Thereafter, the hearing turned again to the issue of the InterStim Device. As to Dr. Guerette, the Court again explained the boundaries of his testimony during the first phase of the trial pertaining to causation:

> In phase one, he can testify, "I treated her back in" — that he treated her back in 2011, 2013. Whatever her physical issues were, he implanted this InterStim device. It was fine . . . she was fine. He didn't see her again until October 2019. . . . [A]t that time, he performed an evaluation of her, and this is what was wrong with her. He can't say why.

(FPTC 1 Tr. 32:17–23.)

---

[8]     "Pelvic organ prolapse (POP) is a common symptom of pelvic floor disorders which is characterized by the descent of the uterus, bladder or bowel from their normal anatomical position towards or through the vagina. . . It is becoming necessary to recognize that POP is a degenerative disease that is correlated with age." Huang, Liwei et al., *Cellular senescence: A pathogenic mechanism of pelvic organ prolapse (Review)*, 22 Molecular Med. Reps. 2155, 2155 (2020).

Plaintiff's counsel then indicated that she sought to introduce evidence that the InterStim device had stopped functioning due to physical force (the accident). In making her argument, Plaintiff's counsel explained:

> [T]he InterStim is essentially a pacemaker for your bladder, and it has electronic programming. And [Dr.] Guerette can read that programming. And . . . he can read that and state that the programming indicated a malfunction with physical force on the date of the accident.

(*Id.* 34:19–25.) When explaining the manner that the InterStim operates, Plaintiff's counsel stated that the device produces a readout of information about which Plaintiff's counsel sought to have Dr. Guerette testify; however, yet again, Plaintiff's counsel had not produced the information in discovery. (*Id.* 36:5–37:1.) Because the information was not provided in discovery and because it necessarily entailed expert testimony interpreting the data, the Court precluded Plaintiff from introducing evidence about the data produced from the device, reiterating that Plaintiff's counsel had an obligation to produce this material in discovery so that defense counsel could have an expert review the material to determine whether it was accurate. (*Id.* 35:24–37:1.) Instead, Dr. Guerette's testimony would be limited to simply whether the device was functioning when he examined Plaintiff in October of 2019. (*Id.* 37:5–18.) The Court also explained that, if Plaintiff establishes causation as to the disputed injuries during the first phase of the trial, Dr. Guerette then could testify in Phase Two about the treatment for the disputed injuries in support of Plaintiff's claim for damages. (*Id.* 33:2–12.)

Plaintiff's counsel then indicated for the first time that the InterStim device and Plaintiff's complaints of a pelvic prolapse were separate issues: "The InterStim is simply part of the overactive bladder situation. However, the prolapse is a wholly new and different complaint that was not present previously." (*Id.* 37:23–25.) Again, the Court indicated that Dr. Guerette could testify as the treating physician as to his observations of Plaintiff's condition when he

12

examined her in October of 2019; however, he could not interpret any information derived from the InterStim device. (*Id.* 38:12–16.) But, again, Plaintiff's counsel's representation that the pelvic prolapse constituted a "wholly new and different complaint that was not present previously" turned out to be false, as this progressive condition initially manifested in 2011, as Dr. Guerette would later explain at trial.

And, again, the Court continued to labor under the misimpression that a connection existed between the inoperable InterStim device and the pelvic prolapse. At the time of this hearing, the Court thought that Dr. Guerette could simply look at the InterStim device and determine that the InterStim device was no longer working. Coupled with testimony from Plaintiff and her partner that the InterStim device was working before the accident, this would allow Plaintiff's counsel to argue that the jury could draw the reasonable inference that the accident caused the InterStim device to no longer function and the pelvic prolapse occurred as a consequence. However, Dr. Guerette's trial testimony would demonstrate otherwise.

Following the hearing, the Court issued an order that reiterated the parameters of Dr. Guerette's testimony regarding the InterStim device:

> As it pertains to Plaintiff's InterStim device, the testimony of Dr. Nathan Guerette shall be limited to his observations of whether the InterStim was functioning during the course of his treatment of Plaintiff. He may not testify as to the cause of the device not functioning nor discuss any readouts from the device.

(ECF No. 55.) It bears noting that, during the hearing, the Court cautioned defense counsel that if he opened the door during cross-examination about the cause of the InterStim not functioning, the Court would allow Plaintiff's counsel to address the issue. (FPTC 1 Tr. 39:1–9.)

### D.   Second Final Pretrial Conference on September 1, 2022

Due to COVID-19-related issues, the Court rescheduled the trial from July 19, 2022, to beginning jury selection on September 12, 2022. (ECF No. 64.) As the trial approached, the

Court became concerned about the testimony by Plaintiff's partner, Gerald Barton, regarding the operability of the InterStim device.  Consequently, the Court conducted a second Final Pretrial Conference on September 1, 2022, and took testimony from Mr. Barton regarding the InterStim device.  (FPTC 2 Tr. (ECF No. 84).)

> During the hearing, Mr. Barton described the InterStim as:
>
> a cell phone-looking device that has a remote piece that attaches or that you hold up against [Plaintiff's] body, and then the cell phone does everything else. . .  The InterStim is a small unit inside of her body that has leads that go to her bladder. . . The transponder piece is the piece that you use externally. . .  You have two pieces.  One of them is the cell phone that you can use to operate, and then you have another piece that goes over her scar where they inserted the InterStim. . . You hold [the piece that goes over her scar] overtop of [the scar]. . . [This piece] is not attached to her body.

(*Id.* 6:19–8:2.)  Mr. Barton further explained that he and Plaintiff would check the operability of the InterStim visually on a monthly basis to determine its operability and the battery life.  (*Id.* 8:5–23.)  According to Mr. Barton, they had checked the operability of the InterStim during the end of June of 2019 shortly before the accident.  (*Id.*)

The Court asked Mr. Barton to explain precisely what he would do to check the operability of the InterStim.  (*Id.* 8:24–9:10.)  Mr. Barton responded that he would hold the cell phone device over Plaintiff's scar, turn the machine on and it would connect with the InterStim device implanted inside of Plaintiff.  (*Id.* 9:4–15.)  Mr. Barton added:  "When you turn it on, it connects with the cell phone; and then you would hold it over the scar, it brings up all of her numbers that her InterStim is set at already, it brings up the InterStim battery life, and at that point you change settings on it."  (*Id.* 9:11–15.)  At that point, Plaintiff's counsel produced a video from the manufacturer's website (marked as Plaintiff's Exhibit 1 for the hearing) that further explained how the InterStim functioned.  (*Id.* 10:13–12:11.)  Mr. Barton explained that he

14

essentially placed a communication device over Plaintiff's scar that relayed information to another device that could be programmed. (*Id.* 12:15–13:5.)

When he last checked the device before the accident, Mr. Barton had observed that the battery life for the device was above fifty percent. (*Id.* 13:10–11.) Mr. Barton checked the device again on the day after the accident and he observed that "the communicator and the device were able to communicate and connect, I was able to check battery life, but I was not able to change any settings." (*Id.* 13:24–14:1.) The battery life was still over fifty percent, but he could not change the settings for Plaintiff's comfortability. (*Id.* 14:1–14.) When he had last checked the device shortly before the accident during the end of June, Mr. Barton was able to change the settings, which he would do to give Plaintiff greater comfort when urinating. (*Id.* 16:12–25.)

Defense counsel moved to exclude Mr. Barton's testimony on a variety of grounds. First, Plaintiff's counsel had not provided notice in discovery that Mr. Barton would testify about the functioning of the InterStim device. (*Id.* 20:18–21:9.) However, because defense counsel had the opportunity to depose Mr. Barton but chose not to, the Court rejected this argument. (*Id.* at 20:4–22:3.) Second, defense counsel argued that the Best Evidence Rule required exclusion of the testimony, because the testimony was based on the device and its printouts that had not been produced in discovery and which were no longer available. (*Id.* 22:19–23:6.) The Court rejected this argument as well, determining that Mr. Barton's testimony only addressed the operability of the device, which he could observe, and not an interpretation of the data contained in the printouts from the device. (*Id.* 22:10–23:16.) In making the ruling, the Court explained, as it had done on repeated occasions, that if Plaintiff were to prevail, the defense would have another

15

opportunity to challenge the Court's ruling in post-trial rulings when the Court would have the benefit of hearing all of the evidence. (*Id.* 23:13–24:3.)[9]

Again, the Court addressed the parameters of Dr. Guerette's testimony, indicating that he could testify that the InterStim device was no longer properly functioning, similar to Mr. Barton's testimony. (*Id.* 35:9–14.) Because Plaintiff's medical records included a reference to the device being "expired," the Court concluded that the term "expired" encompassed "not functioning properly." (*Id.* 35:15–36:9, 45:14–19.)

At the conclusion of the hearing, Plaintiff's counsel sought to preclude defense counsel from mentioning the ad damnum during the first phase of the trial, since damages were not at issue in that phase.[10] The Court initially intended to preclude reference to the ad damnum; however, defense counsel correctly pointed out that it implicated the potential bias of both

---

[9]     In her Motion, Plaintiff submits that the Court's comments that it could grant a Rule 50 after the close of her case suggested a bias against her case. (Mot. at 2–3.) Quite the contrary is true. The Court repeatedly explained that it was concerned that it had stretched the boundaries of that permitted under Virginia law by allowing Plaintiff to attempt to establish causation without expert testimony, instead of granting Defendant's motion in limine. *See, e.g.*, (FPTC 1 Tr. 8:14–15 ("I think this is a tight legal issue here[.]")); (*Id.* 12:23–13:2 ("[T]his is going to be a tough issue. . . I want to look at what that evidence looks like in relation to the law.")); (FPTC 2 Tr. 24:2–3) ("I think there's significant legal issues that I'm going to have to look at.")). Notably, the Court also observed that if Plaintiff did meet her burden as to causation, she was likely going to recover a large amount of damages. (FPTC 1 Tr.13:4–5 ("It seems to me if she hits it, she's hitting it big[.]"); (FPTC 2 Tr. 24:4–7 ("On the other hand, if they hit liability . . . I have a feeling the jury is going to be very sympathetic towards [Plaintiff] and I think that number is going to be big.").

The Court was concerned about the legal ability to establish causation without expert testimony but thought that the more prudent course of action was to allow Plaintiff to develop the evidence at trial before determining whether, as a matter of law, Plaintiff could establish causation. This decision proved prescient as the evidence tendered by Plaintiff at trial conflicted in significant ways from that described by her counsel during pretrial hearings.

[10]     The transcript incorrectly refers to the "addendum"; however, counsel was addressing the ad damnum. (FPTC 2 Tr. 39:17–20.)

Plaintiff and her partner, Mr. Barton, since both could potentially benefit from the millions of dollars that Plaintiff sought. (*Id.* 39:22–42:7.) Consequently, the Court permitted defense counsel to reference the ad damnum purely to establish bias, but also permitted Plaintiff's counsel to establish that the ad damnum arose from Plaintiff's medical treatment and expenses, and also offered to issue a jury instruction regarding the purpose of the question if requested. (*Id.*)

### E.    Relevant Trial Testimony for Phase One

During the first phase of the trial that only addressed causation for the disputed injuries, Plaintiff called three witnesses to testify:  Plaintiff, Dr. Guerette, and her partner Mr. Barton. (Trial Tr., Witness Index at 2.)  The portions of their testimony relevant to the pending motion are summarized.

Plaintiff indicated that she suffered from interstitial cystitis, which is a painful bladder syndrome. (Trial Tr. 34:16–19.)  She had been living with the disorder for a substantial period of time and had previously treated with Dr. Guerette from 2011-13. (*Id.* 35:11–17.)  Dr. Guerette was able to get her to a point that she could live comfortably with the installation of an InterStim device in 2013. (*Id.* 35:18–36:18, 109:8–16.)  Plaintiff described the InterStim device as "a medical device that's implanted to help control the muscles and the overstimulations that comes from the bladder from [interstitial cystitis]." (*Id.* 36:10–12.)  The device alleviated her bladder issues and she was no longer dealing with bladder symptoms by 2019. (*Id.* 36:16–20.)  Plaintiff testified that, during her initial treatment with Dr. Guerette, she had not been diagnosed with a pelvic prolapse.  Indeed, she had never heard of the term "prolapse" before. (*Id.* 36:21–25.)

Plaintiff described the car accident on July 7, 2019. (*Id.* 40:14–45:2.)  The parties stipulated that Plaintiff suffered "injuries to her head, including a concussion, hip, neck, and left

shoulder in the accident.  She also aggravated a pre-existing lower back condition that she had."

(Stipulation No. 3; *Id.* 46:1–4.)  Plaintiff further testified that she had checked the condition of

her InterStim device during the end of June and she had observed that it was operable and

properly functioning.  (Trial Tr. 49:4–50:8.)

       After the accident, Plaintiff began feeling a heaviness in her pelvic area.  (*Id.* 56:12–18.)

The heaviness was similar to what she had experienced in 2013, but it began to worsen.  (*Id.*

57:2–4.)  In October of 2019, Plaintiff returned to see Dr. Guerette.  (*Id.* 63:5–11.)  Her medical

records from the visit indicated pelvic pain that had worsened after the accident, bladder pain and

prolapse heaviness.  (*Id.* 65:16–67:17.)  The injuries from the accident caused her pain when

using the bathroom.  (*Id.* 68:20–24.)  These issues had not been present since 2013.  (*Id.* 68:25–

69:1.)  She examined the InterStim device at the end of July and it was still functioning.  (*Id.*

70:1–10.)  She returned to Dr. Guerette and was diagnosed with a vaginal prolapse.  (*Id.* 70:14–

22.)  Also, her InterStim device was replaced in either January or February of 2020.  (*Id.* 70:23–

71:8.)  The replacement of the InterStim did not offer her any relief.  (*Id.* 71:9–14.)  No other

life events other than the accident in July of 2019 occurred from 2013 until the time that she saw

Dr. Guerette in October 2019.  (*Id.* 73:11–19.)  She had no issues with her pelvic area and the

InterStim device after 2013 until the accident.  (*Id.* 101:21–25.)

       Dr. Nathan Guerette then testified about his treatment of Plaintiff, which began in 2011.

(*Id.* 108:7–117:16.)  He diagnosed her with interstitial cystitis as well as an overactive bladder.

(*Id.* 108:16–19.)  He did not diagnose her with prolapse in 2011 and her pelvic exam at the time

was negative for pelvic organ prolapse.  (*Id.* 108:20–25.)  He continued to treat her until 2013

when he implanted a sacral nerve simulation, known as an InterStim device.  (*Id.* at 109:8–

110:7.)  The purpose of the InterStim device was to address her overactive bladder symptoms

and bladder pain. (*Id.* 109:19–21.) Plaintiff's condition substantially improved with the device by 2013, which is when he last saw her before the accident. (*Id.* 110:8–24.)

Plaintiff returned to see Dr. Guerette in October of 2019. (*Id.* 111:4–6.) Plaintiff then complained of the worsening of her urinary incontinence symptoms, as well as significant urinary urgency and frequency. (*Id.* 111:15–20.) He also observed that she had "apical and exterior pelvic organ prolapse, so her bladder and the top of the vagina were coming down at the time." (*Id.* 112:19–21.) Plaintiff reported to Dr. Guerette that her symptoms began with a car accident that had occurred in July of 2019. (*Id.* 112:24–25.) Ultimately, Dr. Guerette reached two diagnoses of Plaintiff in October of 2019: (1) her InterStim device was no longer functioning correctly, and (2) the loss of pelvic support. (*Id.* 116:21–24.)

As to the InterStim device, Dr. Guerette explained that it was possible that the battery caused the issue, as it was low in its battery life and near the end of its life. (*Id.* 117:3–16.) Dr. Guerette concluded that the InterStim was simply not functioning properly. (*Id.* 117:16.) He ultimately replaced the InterStim in January of 2020. (*Id.* 123:6–11.) Dr. Guerette also made clear that the InterStim device did not treat Plaintiff's prolapse issues. (*Id.* 125:24–25.)

Regarding the pelvic prolapse, Dr. Guerette conceded that when he examined Plaintiff in 2011, he diagnosed her with cystocele, which constituted a vaginal prolapse that he described as "when the bladder is falling down into the vagina." (*Id.* 118:5–13.) Specifically, he diagnosed her at that time with "first degree cystocele." (*Id.* 119:25.) When Plaintiff returned in October of 2019, "it was a significantly larger cystocele." (*Id.* 120:10–11.) Dr. Guerette testified that the cystocele was progressive and that it had progressed by the time that he had examined her in October 2019. (*Id.* 120:17–23.) Her condition had progressed to being "a second- to third-degree cystocele, which is the tissue nearly getting to the opening of the vagina, as well as a mild

uterine and apical, or top of the vagina, prolapse. The back wall where the rectum is was still fine." (*Id.* 125:16–20.)

Mr. Barton testified last for Plaintiff during the first phase of the trial, testifying consistently with his testimony from the pretrial hearing on September 1, 2022. (*Id.* 131:11–142:5.) Mr. Barton indicated that Plaintiff had no issues with the InterStim device before the accident. (*Id.* 134:4–135:10.) He and Plaintiff would check the device once per month, usually at the end of the month, to ensure that it was working properly. (*Id.* 135:15–24.) When they checked the InterStim at the end of June of 2019, the device was working properly and the battery level was around 50%. (*Id.* 136:8–23.) Mr. Barton also indicated that Plaintiff did not have pelvic pain before the accident. (*Id.* 137:22–138:4.) However, after the accident, Plaintiff did endure pelvic issues. (*Id.* 138:10–18.) Moreover, the InterStim device was not working properly, because he was unable to change the settings or the functions. (*Id.* 138:19–139:8.) The battery life for the device remained roughly at the fifty percent level. (*Id.* 138:25–139:1.)

**F.**     **Defendant's Rule 50 Motion and the Verdict as to Phase One of the Trial**

At the conclusion of Plaintiff's case, Defendant moved for a directed verdict under Rule 50 of the Federal Rules of Civil Procedure.  When ruling on the motion, the Court stated:

> I have been led to believe, until now, that there is a nexus between the InterStim and a pelvic prolapse. Dr. Guerette said there is no nexus between the two. They are separate issues in my mind. On the issue of causation, . . . on the InterStim device being [broken] from the accident, I think there's enough for that to go to the jury. I have seen no evidence about the pelvic prolapse.

(*Id.* 148:9–17.) Consequently, the Court denied the motion as it related to the Interstim device, but granted the motion as to the pelvic prolapse as no evidence existed as to causation that connected this condition to the accident. Indeed, during argument on the motion, Plaintiff's counsel made clear that the two issues were not connected. Consequently, the Court needed to

determine whether Plaintiff had established causation as to each alleged injury (malfunctioning InterStim and pelvic prolapse) separately.

The Court found that insufficient evidence had been presented about the pelvic prolapse. In making the finding, the Court noted that, according to Dr. Guerette's testimony, Plaintiff's pelvic prolapse was progressive in nature, had begun eight years before the accident and, therefore, required expert testimony to support a finding of causation. (ECF No. 80; *Id.* 149:4–157:15.)

After argument by counsel regarding the issue of causation as to the malfunctioning of the InterStim device, the jury deliberated and returned a verdict of "not proven" as to the InterStim device. (ECF No. 79; Trial Tr. 211:13–15.) The case then proceeded to the second phase of the trial during which the jury considered the damages to be awarded to Plaintiff based on the undisputed injuries. The jury returned a verdict awarding a total of $105,216 to Plaintiff. (ECF No. 82.)

On October 14, 2022, Plaintiff filed her motion for a new trial or, alternatively to alter or amend the judgment under Rule 59. (ECF No. 87) On October 21, 2022, Defendant responded in opposition, (ECF No. 88), and on October 27, 2022, Plaintiff replied and filed a Proffer of Excluded Evidence (ECF Nos. 89, 90), rendering this matter ripe for review.

## STANDARDS OF REVIEW

### A.    Rule 59(a)

Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on a motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a). Rule 59(a) demands a high burden, however. "The court should grant a new trial only if (1) the verdict is against the clear

weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage

of justice, even though there may be substantial evidence which would prevent the direction of a

verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citing

*Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Servs.,*

*Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996))).  In considering a motion

for a new trial, "'a trial judge may weigh the evidence and consider the credibility of the

witnesses[.]'" *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229,

1237 (4th Cir. 1995) (quoting *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)).

"The decision to grant or deny a motion for a new trial is 'within the sound discretion of the

district court[.]'" *Id.* (quoting *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir. 1985)).

The "crucial inquiry is 'whether an error occurred in the conduct of the trial that was so grievous

as to have rendered the trial unfair.'" *Bristol Steel & Iron Works Inc. v. Bethlehem Steel Corp.*,

41 F.3d 182, 186 (4th Cir. 1994) (citation omitted).

    **B.**    **Rule 59(e)**

    Under Federal Rule of Civil Procedure 59(e), a party can move for the court to alter or

amend a judgment in only one of three situations:  "(1) to accommodate an intervening change in

controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear

error of law or prevent manifest injustice." *Zinkland v. Brown*, 478 F.3d 634, 637 (4th Cir.

2007) (quotations omitted).  "[T]he rule permits a district court to correct its own errors" but

"may not be used, however, to raise arguments which could have been raised prior to the

issuance of the judgment, nor may they be used to argue a case under a novel legal theory that

the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*,

148 F.3d 396, 403 (4th Cir. 1998).  "It is an extraordinary remedy that should be applied

sparingly." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir.1997)).

## ANALYSIS

### A.    Motion for New Trial pursuant to Rule 59(a)

Plaintiff argues that a new trial should be granted under Rule 59(a), because the Court's management of the first phase of the trial prejudiced Plaintiff in three ways:  (1) the Court permitted Defendant's counsel to refer to Plaintiff's damages claim during the causation phase of trial; (2) the Court limited Plaintiff's examination of Dr. Guerette to Plaintiff's October 8, 2019 appointment with Dr. Guerette, despite Plaintiff having subsequent appointments; and (3) the Court questioned Plaintiff's witnesses in the presence of the jury.  (Mot. at 5–6.)  Plaintiff does not argue that the verdict is against the clear weight of the evidence, nor that it is based on evidence which is false.  (*Id.* at 4.)  Plaintiff solely argues that the jury based its verdict on these procedural inconsistencies and, thus, a new trial is required as the verdict rendered was a severe miscarriage of justice.  (*Id.* at 5.)  The Court disagrees, finding that Plaintiff does not meet this high burden, because no "error occurred in the conduct of trial that was so grievous as to have rendered the trial unfair." *Bristol Steel & Iron Works Incorp.*, 42 F.3d at 186.

### 1.    Defense counsel's question regarding damages addressed bias.

The Court permitted Defendant's counsel to refer to the amount of Plaintiff's claim against Defendant during Phase One of the case, but sustained Defendant's objection to Plaintiff's counsel's question regarding Plaintiff's claim for damages.  Plaintiff argues that this "disable[ed] her from providing any sort of context." (Mot. at 5–6.)  Plaintiff correctly notes that, during Phase One of trial, the Court limited testimony to the issue of causation, not damages, which were left for Phase Two.  However, before trial, the Court ruled that Defendant

23

could cross-examine witnesses as to bias or potential motive for their testimony, and thus refer to the requested damages amount. (FPTC 2 Tr. 40:5–21.) The Court also held that Plaintiff could, on redirect, clarify that the demand number was based upon medical treatment and expenses, and that the Court would give a jury instruction, if needed, to clarify why this number would come out in Phase One. (*Id.* 42:3–7.)

During the trial, Defendant's counsel asked Plaintiff on cross-examination if she was suing the Defendant for five million dollars, to which Plaintiff replied, "Correct." (Trial Tr. 88:1–3.) On redirect examination, Plaintiff's counsel then asked Plaintiff whether the five million dollars was "a pie-in-the-sky number?" and Defense counsel objected. (*Id.* 102:13–18.) The Court sustained the objection, despite its prior ruling. (*Id.*) Plaintiff argues that this left the jury thinking that Plaintiff was greedy. (Mot. at 9.)

Importantly, Plaintiff's counsel's question did not comply with the Court's directive that she could respond to Defense counsel's question by asking Plaintiff if the demand was based on her medical treatment and injuries. Instead, Plaintiff's counsel asked colloquially whether her demand was "a pie-in-the-sky number?" The Court interpreted this vague question as addressing the damages calculation, which was reserved for Phase Two. (FPTC 2 Tr. 102:17–18 ("You'll get to discuss that down the road. This [phase] is all about causation.").) Consequently, the Court struck the question as being improper and not tethered to whether Plaintiff (or Mr. Barton) had a financial motive for their testimony.

Moreover, Plaintiff did not attempt to argue that the objection was incorrectly sustained during trial, nor did she seek to re-ask the question in a proper manner or ask the Court to instruct the jury on this point as the Court had previously offered. Further, Plaintiff's counsel did not attempt to rehabilitate Mr. Barton on redirect examination when Defense counsel also asked

him about the five-million-dollar demand. (*Id.* 142:17–19.) And, Plaintiff's counsel never mentioned the ad damnum or the issue of bias during closing or rebuttal argument during Phase One. (*Id.* 182:8–188:24; 198:22–201:22.)

Further, even if the Court erred by precluding Plaintiff's counsel from asking her "pie-in-the-sky" question, this does not give rise to a miscarriage of justice nor "was so grievous as to have rendered the trial unfair." *Bristol Steel & Iron Works Inc.*, 41 F.3d at 186. Plaintiff does not present any argument to show that sustaining that objection and preventing that line of questioning weighs so "heavily against the verdict that to deny a new trial would be contrary to the 'interests of justice.'" *United States v. Wood*, 340 Fed. App'x 910, 911 (4th Cir. 2009). Indeed, had the Court not sustained the objection and Plaintiff testified consistent with the Court's previous ruling that her demand arose from the medical treatment that she received, Plaintiff and her partner would still have a motive or bias to testify in a manner that favored their recovery. In other words, Plaintiff suffered no harm from the sustaining of the objection. Accordingly, the Court DENIES Plaintiff's motion for a new trial on this ground.

### 2.    Dr. Guerette's testimony conformed with the Court's prior rulings.

Plaintiff also argues that, during Phase One of the trial, the Court inconsistently admitted evidence regarding the limits of Dr. Guerette's testimony as a lay witness. (Mot. at 10.) First, Plaintiff argues that the Court cabined Dr. Guerette's testimony further than necessary and limited Plaintiff's ability to provide evidence about Plaintiff's InterStim device failure. (*Id.* at 11.) Second, Plaintiff argues that the Court permitted Defendant's counsel to "open the door" to expert testimony when he asked for opinions that only an expert witness was qualified to testify to, and, as such, Plaintiff should have been allowed to ask expert opinions of Dr. Guerette. (*Id.* at 10.) This claim constitutes nothing more than Plaintiff's counsel attempting to correct her

own trial errors. Thus, the Court disagrees on both fronts, and finds that the Court ruled consistently with its prior orders.

First, the Court did not err in limiting Dr. Guerette's testimony during Phase One to only his treatment of Plaintiff in 2019, rather than allowing Plaintiff to ask about additional treatment thereafter. (Trial Tr. 113:11–114:11.) The Court previously, and repeatedly, limited Dr. Guerette's testimony to facts regarding his treatment of Plaintiff in 2013, before the accident, and in October 2019, the first time that Plaintiff saw Dr. Guerette after the accident. *See, e.g.*, (FPTC 2 Tr. 45:1–19.) Any other testimony expanded beyond the scope of lay treating physician testimony. Plaintiff, by failing to designate Dr. Guerette as an expert, thus could not use such type of testimony.[11] (FPTC 1 20:13–21.)

Second, Plaintiff argues that Defendant's questioning of Dr. Guerette about Plaintiff's InterStim diagnosis regarding the term "expired" "opened the door" to expert testimony.[12] (Mot. at 14–15); *see, e.g.*, *United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995) ("A district court may allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible."). Indeed, Plaintiff correctly notes that the Court held previously that if Defendant opened the door to testimony that required an expert opinion to answer, then Plaintiff could also ask Dr. Guerette for expert opinions. (ECF No. 30 at 20.) However, Plaintiff's counsel failed to ask any questions on

---

[11]    *See infra* Analysis Section B, Parts 2–4 (holding that Dr. Guerette was limited to lay testimony regarding course of treatment).

[12]    Additionally, Plaintiff's counsel argues that the Court should have allowed her to expand the scope of Dr. Guerette's testimony on direct examination, because Defendant asked questions about treatment outside the scope of lay testimony. (Mot. at 14.) However, her questions regarding Plaintiff's treatment in 2019 were asked during the direct examination of Dr. Guerette, when Defendant could not have yet "opened the door" to expert testimony.

redirect examination that took advantage of the open door. For example, Plaintiff's counsel could have asked on redirect examination about how Dr. Guerette defined "expired" but she did not. Plaintiff's counsel cannot now argue that the Court did not permit her to do so when she did not even try. Plaintiff's counsel asked only five questions on redirect, none of which related to the term at issue, "expired." (Trial Tr. 125:5–126:5.) Nor did Plaintiff's counsel object to the scope of Defendant's counsel's questioning. In so not doing, Plaintiff waived any argument that Defendant's introduction of such expert testimony should have allowed Plaintiff to ask about it.

In short, Plaintiff cannot now ask the Court to "reconsider" something that her counsel failed to pursue during trial. Therefore, the Court DENIES Plaintiff's motion for a new trial on this issue.

### 3.    The Court's questioning did not prejudice Plaintiff.

In support of her Rule 59(a) motion, Plaintiff lastly argues that the Court influenced the jury by asking questions of witnesses and summarizing testimony. (Mot. at 16.) However, the Court has wide discretion in questioning witnesses, especially in a civil trial, and thus, doing so did not give rise to such unfairness as to render the trial a miscarriage of justice.

First and foremost, the Court can ask questions of witnesses and is permitted to do so during a civil jury trial. "[I]t is settled that a trial judge possesses broad authority to interrogate witnesses." *United States v. Godwin*, 272 F.3d 659, 672 (4th Cir. 2001) (citing Fed. R. Evid. 614(b) (ruling that "[t]he court may interrogate witnesses, whether called by itself or by a party")). Thus, "the judge is entitled to propound questions pertinent to a confused factual issue which requires clarification. He may also intercede because of seeming inadequacy of examination or cross-examination by counsel, or to draw more information from reluctant witnesses or experts who are inarticulate or less than candid." *United States v. Cassiagnol*, 420

27

F.2d 868, 879 (4th Cir. 1970) (citing *Jackson v. United States*, 329 F.2d 893, 894 (D.C. Cir. 1964)).  That is exactly what the Court did here.

The Court asked questions to ferret out confusing factual issues and to assist the inadequate direct examination by counsel.  This constitutes behavior well within the province of a trial judge.  Indeed,

> [i]t cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such a way as to be understood by the jury, as well as by himself. *He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other.*

*Lindsey v. City of Beaufort*, 911 F. Supp. 962, 970 (D.S.C. 1995) (quoting *Simon v. United States*, 123 F.2d 80, 83 (4th Cir. 1941)) (emphasis added).  And, "[i]f a party perceives such questioning to be improper, an objection may be made 'at the time or at the next available opportunity when the jury is not present.'" *Godwin*, 272 F.3d at 672 (quoting Fed. R. Evid. 614(c)).  Here, despite numerous recesses, Plaintiff's counsel did not object until this post-verdict motion for a new trial.  She made no indication during either phase of trial that she perceived such questioning to be beyond the scope of the Court's purview.

Furthermore, it is well settled that a judge is permitted to summarize or explain evidence to assist the jury, so long as the Court retains an air of impartiality during the trial:

> It is within [the judge's] province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469 (1933) (citations omitted). Plaintiff makes no claim in her motion that the Court crossed the line of impartiality, nor that the Court only asked or commented on the questioning of one side.

While Plaintiff suggests that the Court's comment to Plaintiff's counsel "it's your burden to establish why that happened," "effectively implied that Plaintiff had failed to prove causation," (Pl. Mot. at 18; Trial Tr. 114:11), this statement almost directly mirrors the jury instructions. The instructions state that "[t]he burden is on the plaintiff, Samantha Roop, to prove by the greater weight of the evidence each injury that she claims and to prove that each injury was caused by the negligence of the Defendant, Nicholas Desousa." (Trial Tr. 174:22–25.)

Additionally, the Court provided the jury with not one, but two, other jury instructions on the Court's role during the trial and how the jury should weigh its comments and questions.[13] These instructions further lend credence to the fact that the Court not only had discretion in questioning witnesses and helping clarifying issues for the jury, but that the parties anticipated the potential for questioning, as did the Court, which sought to limit its influence on the jury from the get-go.

Thus, the Court's questioning constituted an action well within its discretion and does not give rise to a miscarriage of justice nor the conclusion that the trial became substantially unfair.

---

[13]    Jury Instruction Two reads, "No statement or ruling or remark that I may make during the course of the trial is intended to indicate my opinion as to what the facts are. It is the function of the jury to consider the evidence and determine the facts in this case. You, not I, have the duty to determine the facts." (Trial Tr. 165:21–25.)

Jury Instruction Seven continues, "During the course of the trial, I've occasionally asked a few questions of the witnesses. Do not assume that I hold any opinion on the matters to which my question is related. The Court may ask a question simply to clarify a matter — not to help one side of the case or to hurt another side." (*Id.* at 170:8–13.)

As Plaintiff failed to reach her burden of proving that any of her three claims caused the trial to be grievously erroneous, *Bristol Steel & Iron Works Inc.*, 41 F.3d at 186, the Court DENIES Plaintiff's motion for a new trial under Rule 59(a).

**B.     Motion to Amend or Alter Judgment pursuant to Rule 59(e)**

Plaintiff alternatively argues that the Court should amend and reverse its grant of Defendant's motion for judgment as a matter of law under Rule 50, because it committed a clear error of law when it ruled that lay testimony was insufficient for the jury to find for Plaintiff on the issue of causation on Plaintiff's pelvic prolapse injuries. (Mot. at 19.) Plaintiff claims that the Court's ruling constituted clear error as it contravened Fourth Circuit precedent concerning requirements of expert witnesses, the Federal Rules of Evidence and Virginia substantive tort law on causation. (*Id.*) The Court disagrees, finding that the complexity of Plaintiff's pelvic injuries required an expert to opine on causation. Here again, we return to Plaintiff's counsel's discovery failings, as Plaintiff's motion presents an attempt to relitigate her case following trial after she failed to designate her key witness as an expert. This she cannot do. *See In re: Reese*, 91 F.3d 37, 39 (7th Cir. 1996) ("A motion under Rule 59(e) is not authorized 'to enable a party to complete presenting h[er] case after the court has ruled against h[er].'").

First, the Court will examine how the Federal Rules of Civil Procedure and Evidence limit expert and lay testimony. Second, the Court will turn to substantive Virginia law requirements regarding expert testimony and causation. Lastly, the Court will analyze whether it committed clear error in limiting Dr. Guerette to lay testimony only and granting Defendant's Rule 50 motion due to the lack of expert testimony on causation regarding Plaintiff's pelvic prolapse. The Court concludes that no error — nonetheless, clear error — was committed and will therefore DENY Plaintiff's Rule 59(e) motion.

1.    **The Federal Rules of Civil Procedure and Evidence govern expert testimony limitations in federal trials.**

Federal Rule of Civil Procedure 26(a)(2) sets forth mandatory expert witness disclosures. Rule 26(a)(2)(A) requires parties to disclose the identity of expert witnesses, while Rule 26(a)(2)(B) provides that witnesses retained to provide expert testimony must supply a report. Federal Rules of Evidence 701 and 702 govern whether a party need designate someone as an expert, and whether that expert requires a report, for civil cases in federal court.

A party that fails to comply with Rule 26 "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Accordingly, "[i]t is clearly within the court's power under Rule 37(c)(1) to exclude witnesses who are not properly identified." *Ingram v. ABC Supply Co., Inc.*, 2010 WL 233859, at *2 (D.S.C. Jan. 14, 2010); *see S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003) (holding that "the district court did not abuse its discretion in excluding [an expert] opinion due to [the plaintiff's] failure to timely disclose it"). Further, "[m]ere inadvertence is an uncompelling explanation for failure to identify treating physicians as experts." *Springs*, 2021 WL 119303, at *3 (citing *Wiseman v. Wal-Mart Stores, Inc.*, 2017 WL 4162238, at *5 (D. Md. Sept. 19, 2017)). Moreover, courts "need 'to be alert to efforts to smuggle expert testimony into the case . . . by characterizing it as lay testimony.'" *City of Huntington v. AmerisourceBergen Drug Corp.*, 2021 WL 933867, at *5 (S.D.W.V. March 11, 2021) (quoting 8A Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, *Fed. Prac. & Proc. Civ.* § 2031.1 (3d ed. 2020)).

As mentioned above, under Federal Rule of Evidence 701, opinion testimony by lay witnesses must be rationally based on the witness' perception, helpful to clearly understanding

the witness' testimony or to determining a fact in issue, and "not based on scientific, technical, or other specialized knowledge" within the scope of Federal Rule of Evidence 702. Testimony based on "scientific, technical, or other specialized knowledge" must be given by witnesses who qualify as experts under Rule 702. *See Ingram*, 2010 WL 233859, at *2 (quoting Fed. R. Evid. 702). Courts have held that a treating physician's testimony about a patient's diagnosis, prognosis, and future medical care is based upon "scientific, technical, or other specialized knowledge," thus requiring expert designation under Fed. R. Civ. P. 26(a)(2)(A). *Id.* (citing *Aumand v. Dartmouth Hitchcock Med. Ctr.*, 611 F. Supp. 2d 78, 88 (D.N.H. 2009)). A treating physician becomes a retained expert when a party intends the physician "to explore areas within their medical expertise but beyond the scope of matters learned during treatment[.]" *Moore v. McKibbon Bros.*, 1999 WL 1940029, at *2 (E.D.N.C. Jan. 8, 1999) (citation omitted). Some courts find that "matters learned within the course of treatment would include observations and opinions about diagnosis, causation, treatment, prognosis, costs of treatment and estimates of future such costs," *id.*, while others place diagnosis, prognosis, and future medical care under Rule 26(a)(2)(A)'s expert disclosure requirement, *Ingram*, 2010 WL 233859, at *2. Furthermore, district courts in this circuit distinguish between treating physician expert testimony which requires reporting and treating physician lay testimony which does not: "reports are not required so long as their testimony relates to information learned during the scope of their treatment[,]" however, retained experts require reports. *Moore*, 1999 WL 1940029, at *2

Courts generally permit treating physicians to testify as fact witnesses but exclude their testimony to the extent it consists of expert opinion testimony. *E.g., Springs*, 2021 WL 119303, at *3 (when plaintiff failed to disclose treating physicians as experts, court permitted them to

provide testimony about their observations and course of treatment at the time they treated him, but not any opinions that they formulated based on scientific, technical or specialized knowledge after they treated plaintiff); *Ingram*, 2010 WL 233859, at *3 (when plaintiff failed to disclose treating physicians as experts, court prohibited them from opining on "plaintiff's diagnosis, prognosis, and future medical needs [and restricted them] to providing testimony about their individual factual treatment of plaintiff, as such treatment is documented in the medical records").

Plaintiff argues that a federal district court sitting in diversity, and thus applying Virginia substantive law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), need not require an expert to testify as to causation. Thus, according to Plaintiff, the failure to designate a treating physician as an expert under Federal Rule of Civil Procedure 26(a)(2)(A) should not limit the witness to only lay testimony; a treating physician can testify as to causation as a lay witness and not run afoul of Federal Rule of Civil Procedure 37's preclusion mandate nor the limits on lay testimony under Federal Rule of Evidence 701. The Court disagrees.

### 2. Expert testimony is required under Virginia law to establish complex causation.

The Court turns to Virginia law to determine whether expert testimony was necessary to establish causation for Plaintiff's pelvic prolapse issues.[14] As previously noted, in his pretrial motion in limine, Defendant insisted that Virginia case law, most notably the Virginia Supreme Court's decision in *McMunn*, mandated expert testimony to establish causation for Plaintiff's injuries. (ECF No. 19 at 5-6.) In *McMunn*, the Virginia Supreme Court explained:

---

[14]    *See supra* note 3 (noting that the Court and the parties agree that Virginia law applies to the instant case).

> The question whether a particular treatment is medically necessary, however, and the often more difficult question whether it is causally related to a condition resulting from some act or omission on a defendant's part, can usually be determined only by a medical expert qualified in the appropriate field who has studied the plaintiff's particular case.

*McMunn*, 379 S.E.2d at 914. Indeed, as previously noted, the court went on to hold that:

> where the defendant objects to the introduction of medical bills, indicating that the defendant's evidence will raise a substantial contest as to either the question of medical necessity or the question of causal relationship, the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship, or both, as appropriate.

*Id.*

However, courts distinguish between simple and complex causation, in part by requiring differing levels of expert testimony and degrees of medical certainty in linking alleged injuries with negligent conduct. For simple causation, such as being hit and a bruise developing, lay testimony often suffices to establish causation. *See, e.g.*, *Todt v. Shaw*, 286 S.E.2d 211, 213 (Va. 1982) (soft tissue injuries following a car accident established by lay testimony). In contrast, for complex causation, such as injuries that arise from interrelated medical issues or exacerbation of preexisting conditions, courts often require expert witnesses to opine on causation, to elucidate issues for the jury and to ensure that jurors do not succumb to logical fallacies in determining liability. *See, e.g.*, *Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 709–10 (W.D. Va. 1999) ("Where an expert's opinion merely cites a 'cause and effect' relationship, without supporting medical data which can eliminate other causes, it is merely a conclusory opinion.").

In its pretrial ruling on Defendant's motion in limine, the Court drew a distinction based on the facts as wrongly portrayed at that time by Plaintiff's counsel. The Court allowed Plaintiff to move forward on the issue of causation based on its understanding that the issue was solely whether the InterStim device was operable after the accident, which lay testimony could establish. The Court also believed wrongly that the inoperability of the InterStim device led to

34

the pelvic prolapse, despite Dr. Guerette ultimately testifying at trial that the InterStim device had no relationship to Plaintiff's prolapse issues. And, as recounted above, Plaintiff's counsel explicitly told the Court on two occasions that Plaintiff's prolapse issues did not exist before the accident when, instead, this degenerative condition first arose roughly eight years before the accident.

The Court's pretrial ruling recognized that the law does not view the necessity for experts on causation equally — the underlying injury matters. For injuries that most people understand, and likely have suffered, such as a bruise or broken arm, courts allow treating physicians or lay witnesses to testify to causation or to establish causation via inferences. Juries can understand, for example, "I fell off my bike, my arm broke, the fall caused the break." *Cf. Springs*, 2021 WL 119303, at *3 (regarding second-degree burns from spilled hot coffee). However, for complex causation issues, especially regarding complicated medical injuries, the law recognizes the limits of lay juror understanding and common knowledge. While a lay person understands what a bruise feels like, or whether a medical device like an InterStim device is "on" or "off", he or she likely does not know what an apical vaginal prolapse is or how it progresses, let alone what causes it.

Additionally, the more that preexisting medical conditions, interrelated injuries, or overlapping symptoms come into play, the more that an expert is needed. While these types of injuries often arise under medical practice or products liability cases, rather than car accidents, this alone does not obviate the need for an expert. *Cf. McCauley v. Purdue Pharma L.P.*, 331 F. Supp. 2d 449, 464 (W.D. Va. 2004) (in a products liability case "proof of causation must ordinarily be supported by expert testimony because of the complexity of the causation facts").

In denying Defendant's Rule 50 motion as to the InterStim device, but granting it as to the pelvic prolapse, the Court drew the very distinction that Virginia law commands. For a simple issue such as whether a device is properly functioning, lay testimony, particularly from an experienced user of the device, can establish whether it was simply operable. But that same lay witness cannot interpret specialized data that the device may produce. Similarly, lay testimony cannot support a finding of causation as to a degenerative condition that spans years of treatment that progresses from one stage to another. Virginia law, as well as the law from other courts in this Circuit, support that conclusion.

Plaintiff argues that the Court erred in holding, as a matter of law, in ruling on Defendant's Rule 50 motion, that expert testimony was required to prove causation regarding Plaintiff's pelvic prolapse. (Mot. at 19–21.) The Court disagrees, holding that Plaintiff's pelvic prolapse falls into the latter category of complex causation, thus requiring expert testimony for there to be sufficient evidence for the issue of causation to go to the jury.

First, Plaintiff correctly notes, as does the Court, that tort actions arising under Virginia law do not always require expert testimony to prove the issue of causation: "While failure or inability to adduce direct medical evidence, generally relied upon to establish causal connection between injury and accident, may significantly increase the plaintiff's risk of non-persuasion, such evidence is not a prerequisite to recovery." *Sumner*, 257 S.E.2d at 827; *see also Todt*, 286 S.E.2d at 213 ("[L]ay testimony of causal connection between an automobile accident and injury is admissible for whatever weight the fact finder may choose to give it, even when medical testimony fails to establish causal connection expressly."). However, the above cases differ significantly from the injuries at issue here. In *Sumner*, the plaintiff suffered an automobile accident which caused him back pains for which he sought medical care two days after the

accident. 257 S.E.2d at 827.  Despite the plaintiff's prior back pain condition, the severity of the

accident combined with the immediate injury and treatment by physicians was sufficient to send

the issue of causation to the jury based on lay testimony.  Yet, a violent accident causing

immediate back pain remains a far cry from diagnosis and causation of a degenerative condition

such as a pelvic prolapse that began roughly eight years before an accident.

     A layperson can understand soft tissue injuries resulting from an accident.  Even a simple

analysis explains why this is so.  Members of the jury have likely pulled a muscle, endured a

bruise or broken a bone.  Comparatively, the average juror, indeed the average judge, remains

simply unqualified to determine when a preexisting, degenerative condition appeared, especially

during a stretch of eight years, a time when other medical issues in the same area of the body

arose independently from the accident.  Indeed, Plaintiff's own counsel clearly misunderstood

the nature of her client's injuries, as evinced by her misstatements to the Court during pretrial

hearings that the prolapse issue did not exist until after the accident.

     Similarly, in *Todt*, following an accident, the plaintiff suffered from back and neck

injuries immediately and testified that a year later she continued to have "trouble" and strenuous

activity "caused [her] back and stuff to start aching[.]"  286 S.E.2d at 213.  The Court held that

expert medical testimony was not required to establish the causal connection between the injury

and accident, and the plaintiff could rely on whatever weight the fact finder wanted to give her

testimony.  *Id.*  Again, back and neck pain — common injuries stemming from automobile

accidents, and their continued aches in the months following — constitute the type of injures that

jurors can readily understand.  Pelvic prolapse, on the other hand, constitutes a complicated

medical issue that takes many forms and can be caused by a myriad of issues, only one of which

is physical force. Thus, prolapse is more akin to the complex issues for which expert testimony is required, either statutorily or via common law. The Court now turns to complex causation.

As mentioned above, Virginia law itself distinguishes between run-of-the-mill medical causation issues and more complicated issues, such as when a contested treatment is medically necessary. Indeed, *McMunn* dealt with a complication arising from a dental extraction due to preexisting conditions of the plaintiff. 379 S.E.2d at 909. The Virginia Supreme Court held that when a defendant objects to the introduction of medical bills — contesting whether a particular treatment is medically necessary or the causal relationship between negligence and injury — then "the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship[.]" 379 S.E.2d at 914; *see also Blanco v. United States*, 2021 WL 9860512, at \*8 (E.D. Va. July 15, 2021) (citing *McMunn* for the proposition that expert foundation is required before challenged medical bills are admitted in federal trial).

The requirement of expert testimony to establish causation under Virginia law does not end with contested medical bills, however. Virginia courts require expert medical testimony regarding proximate causation in medical malpractice and products liability suits, as well. These cases often involve complicated injuries and complex causation issues. *See, e.g., Summers v. Syptak*, 801 S.E.2d 422, 426 (Va. 2017) (requiring expert testimony in medical malpractice context); *McCauley*, 331 F.Supp.2d at 464 (requiring expert testimony when applying Virginia law in a products liability action).

For medical malpractice cases, "the general rule is that an expert is required to establish that the defendant['s act] . . . 'was a proximate cause of the injuries claimed.'" *Summers*, 801

S.E.2d at 425 (quoting VA Code § 8.01-20.1).[15]  This stems from the fact that these issues "often

fall beyond the realm of common knowledge and experience of a lay jury." *Beverly Enterprises-*

*Virginia, Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994).  In *Summers*, the existence of the plaintiff's

preexisting conditions made "discerning the causal connection between [the act] and [the

patient's] resulting injuries [] a complicated medical question that is not within the understanding

of a lay person." 801 S.E.2d at 426 (quotation omitted).  "A lay jury is not equipped from

common experience with the knowledge of what can cause the aggravation of complex

preexisting medical problems . . . Consequently, expert testimony is required." *Id.*

        So too here.  Plaintiff's treating physician, Dr. Guerette, testified that, from 2011 to 2013,

Plaintiff experienced bladder issues and was diagnosed with first degree cystocele — the early

stage of prolapse, which is a progressive condition.  (Trial Tr. 125:5–23.)  Six years after last

treating Plaintiff, Dr. Guerette next saw Plaintiff in October of 2019.  At that time, Plaintiff

suffered from a apical vaginal prolapse and cystocele: both types of prolapses that can be caused

by degeneration, according to Dr. Guerette.  This mirrors the situation in *Summers*, where a lay

juror could not parse between an event occurring — either, there, seeing a physician or, here,

getting in an accident — and the cause of the injury.  There, the Court held that proximate cause

could not be proven solely by the logical fallacy *post hoc ergo propter hoc*, which assumes a

causal relationship from a merely sequential one. *Summers*, 801 S.E.2d at 426–27 (citing

Black's Law Dictionary 1285 (9th ed. 2009) (defining *post hoc ergo propter hoc* as "after this,

therefore because of this").)  Therefore, Virginia courts require plaintiffs to produce an expert in

---

[15]     Under Virginia law, a statutory presumption exists that expert testimony is required for
medical malpractice suits. *Id.* at 426 (citing VA Code § 8.01-20.1).  No such presumption exists
for negligence suits under Virginia law, although the analogy still holds true.

such cases. *Id.* (dismissing the action at summary judgment when no expert was produced by the plaintiff).

Similarly, while "Virginia tort law does not mandate expert testimony to show proof of causation in every case . . . in a products liability action, proof of causation must ordinarily be supported by expert testimony because of the complexity of the causation facts." *McCauley*, 331 F. Supp. 2d at 464. In *McCauley*, a federal court applying Virginia law held that "complex medical conditions whose symptoms may overlap and that are properly diagnosed by experienced professionals with appropriate medical knowledge" requires expert testimony on causation. *Id.* The court rejected the idea that the jury be allowed to apply the logical fallacy of *post hoc, ergo propter hoc*, as "[t]he plaintiff's burden [wa]s greater than merely showing a temporal link between [the act] and the injuries they sustained." *Id.* at 465 (finding it was instead evidence of causation that the plaintiffs lacked). While in *McCauley* the plaintiffs put forth an expert, their expert "fail[ed] to make the issue of causation less speculative or conjectural because it fail[ed] to eliminate the possibility that other [things] are to blame for [the plaintiff's] injuries." *Id.* at 463.

Here, Dr. Guerette, while not testifying as an expert, similarly failed to make the issue of causation regarding Plaintiff's prolapse less speculative as he testified to nothing more than the existence of different stages of prolapse at different times spanning an eight-year time period. *See, e.g.*, (Trial Tr. 125:5–23.) Plaintiff's and Mr. Barton's testimony also provided nothing more than temporal changes, which the *McCauley* and *Summers* courts both rejected under Virginia law.

Plaintiff correctly notes that "[i]n certain rare instances, . . . expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's

common knowledge and experience." *Beverly Enterprises-Virginia, Inc.*, 441 S.E.2d at 3 (not requiring expert testimony in lawsuit regarding a failure to aid with eating which led to the plaintiff choking on food). Indeed, this is the very distinction that the Court drew between simply observing whether the InterStim device was operable in contrast to the complex nature of a degenerative muscular condition such as pelvic prolapse, where the condition had progressed over an eight-year time span.[16]

Again, this differs markedly from Plaintiff's complicated theory of pelvic prolapse causation that spans years and numerous diagnoses and clearly does *not* "lie[] within the range of the jury's common knowledge." *Id.* While a jury may easily understand how a person can choke on food or break an arm without an expert explaining it, the average lay-juror has no knowledge base regarding how, when or why a woman's pelvic muscles prolapse.

> 3. **Sister courts applying analogous substantive state law require expert testimony regarding causation under Federal Rule of Evidence 702.**

Sister courts in our circuit applying analogous substantive state law, under the federal procedural rules, require expert testimony regarding causation when it veers into or close to traditional expert testimony under Federal Rule of Evidence 702. The Fourth Circuit and district courts in North Carolina, South Carolina and West Virginia all have required that plaintiffs provide expert testimony on causation when it flies too close to "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702, or, alternatively, when the subject matter "is so far

---

[16] Even though the pretrial hearings focused on the InterStim device, the issues with this device largely constituted a red herring, as Dr. Guerette plainly testified that the InterStim device played no role as to the pelvic prolapse. (Trial Tr. 125:24–25.) Moreover, Plaintiff offered no evidence about the impact on her condition from the inoperability of the InterStim device. Indeed, even though Plaintiff presented to Dr. Guerette in October of 2019 as being in distress, Dr. Guerette waited three months — until January of 2020 — to replace the device. (*Id.* 123:6–8.) And, even after he did so, the InterStim device did not improve Plaintiff's condition regarding her pelvic prolapse. (*Id.* 124:15–17.)

removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease, or a physical condition." *Talyor v. Shreeji Swami, Inc.*, 820 Fed. App'x. 174, 176 (4th Cir. 2020) (applying North Carolina law).

The Fourth Circuit has held that while proximate cause "is ordinarily a question to be determined by the jury as a fact in view of the attendant circumstances," "if the evidence be so slight as not reasonably to warrant the inference [of proximate cause], the court will not leave the matter to speculation of the jury." *Id.* at 175–76 (quotations omitted). One such circumstance arises when lay testimony insufficiently establishes causation with respect to injuries alleged and, thus, evidence from a medical expert is required. *Id.* (requiring, under North Carolina law, expert testimony to opine on the plaintiff's exacerbation of his claustrophobia, PTSD, depression, anxiety and GERD following an elevator malfunction).

These states' substantive laws separate the need for an expert to prove causation in a negligence case alleging personal injury with those that do not, based on the level of complexity between the "particular impact and the resulting wound." *Taylor*, 820 Fed. App'x at 176. "Some injuries — such as bruises, lacerations, and broken bones — manifest in such an immediate and apparent manner that any observer can discern the causal relationship . . . But other injuries . . . are beyond the ability of a layman to attribute to a particular event unaided." *Id.* In the latter case, expert medical testimony is essential to establish causation. *Id.* (citing *Gillikin v. Burbage*, 139 S.E.2d 753, 760 (N.C. 1965) ("Where a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony.")); *see also Ingram*, 2010 WL 233859, at *3 (not permitting non-expert treating physicians from providing

42

any expert opinions on diagnosis, prognosis or future medical needs, and restricting them to factual treatment of the plaintiff under South Carolina law); *Stogsdill v. S.C. Dept. of Health & Human Servs.*, 2017 WL 3142497, at \*15 (D.S.C. July 25, 2017) (same).

Other states such as West Virginia also require that proximate cause be proven by expert testimony in similar situations. *See Hicks v. Chevy*, 358 S.E.2d 202, 205 (W.Va. 1987) (holding that in a medical malpractice suit "proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony"); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 (4th Cir. 1990) (requiring, under West Virginia products liability law, that proof of causation be by expert testimony, stated in terms of reasonable probability).

While this Court must apply Virginia law to this case, the Fourth Circuit's analysis of North Carolina law to similar facts remains highly persuasive.  In *Taylor*, the Circuit Court found that the plaintiff's complex preexisting conditions were "more like a ruptured disc or tingling sensation," which, in other cases, required expert testimony to link their cause to a car accident, while a bruise did not.  820 Fed. App'x at 177.  The court held that "whether a particular traumatic event caused a particular exacerbation . . . 'involve[d] complicated medical questions far removed from the ordinary experience and knowledge of layman[,]'" even if a jury person could understand the concepts in the abstract.  *Id.* at 178.  Thus, since the connection between the injuries alleged and the defendant's negligence "[wa]s the opposite of 'simple, uncontradictory, and obvious' . . . expert medical testimony [wa]s necessary to prove proximate causation."  *Id.* The same could be said of Plaintiff's prolapse, which sounds more akin to a ruptured disc than a bruise; prolapses are neither simple nor obvious.

Therefore, in applying the Federal Rules of Evidence and Civil Procedure to Virginia substantive negligence law, and looking to our sister and circuit courts for guidance, the Court

did not err by precluding Dr. Guerette from testifying as to the cause of Plaintiff's prolapses. As expert testimony was required to prove causation, nor did the Court err in removing this question from the jury in granting Defendant's Rule 50 motion.

>        **4.      The Court did not commit clear error in limiting a treating physician's lay testimony as to causation regarding Plaintiff's pelvic prolapse.**

Requiring expert testimony to establish complex causation relating to Plaintiff's pelvic prolapse did not constitute clear error. The type of testimony needed for this manner of injury exceeded the scope of lay testimony that could be submitted to the jury based upon inferences alone. As mentioned above, the testimony that Plaintiff sought to introduce through Dr. Guerette constituted textbook expert testimony. The injuries at issue are complex, degenerative, unfamiliar to the average juror, and can stem from many, interrelated causes. *Taylor*, 820 Fed. App'x at 178. Furthermore, even despite numerous briefings and hearings on the issues, the Court itself, and at times both parties, conflated and confused the injuries and issues of causation, illustrating the need for expert opinion testimony on these very same issues. If Plaintiff herself or her counsel cannot clearly articulate a theory of causation, how can a jury be expected to delineate nuanced theories of medical causation without any guidance? Thus, the Court rightly granted Defendant's Rule 50 motion on the issue of pelvic prolapse, as Plaintiff introduced insufficient evidence on this injury absent an expert opinion on causation. *Id.*; *see also Summers*, 801 S.E.2d at 426 (dismissing under Virginia law, medical malpractice suit due to lack of expert testimony on plaintiff's complex causation issues).

The Supreme Court of Virginia has held that:

> Negligence and an accident, however, do not make a case. As between them
> there must be causal connect. "The evidence tending to show casual connection
> must be sufficient to take the question out of the realm of mere conjecture, or
> speculation, and into the realm of legitimate inference, before a question of fact
> for submission to the jury has been made out."

*Wilkins v. Sibley*, 135 S.E.2d 765, 767 (Va. 1964) ("It is incumbent upon the party complaining

to establish by a preponderance of the evidence that the accident occurred as the proximate result

of an act . . .") (quotations omitted). Plaintiff here failed to make her case and provide more than

"mere conjecture" on the issue of her pelvic prolapse's cause due to the lack of expert testimony.

*Id.* This is factually and legally insufficient. *McCauley*, 331 F.Supp.2d at 465 (rejecting the idea

that temporal inferences sufficiently demonstrate causation in order to send the issue to the jury).

As such, the Court did not commit clear error in granting Defendant's Rule 50 motion, because

Plaintiff did not sufficiently provide evidence on causation on her prolapse to submit it as a

question of fact to the jury. Thus, Plaintiff's motion under Rule 59(e) must fail.

### 5. The Court correctly limited its analysis to the evidence presented at trial.

Furthermore, courts correctly act within their discretion in not allowing evidence to come

in that could have come in sooner. *Ingle v. Yelton*, 439 F.3d 191, 198 (4th Cir. 2006) (holding

that Rule 59(e) motions may be granted "to account for new evidence not available at trial");

*Zinkland*, 478 F.3d at 637 ("[T]he court, of necessity, has some discretion to determine whether

additional evidence should be considered or further argument heard."). A court should deny a

Rule 59(e) motion if the evidence is not "new" and the justifications for not presenting it earlier

"were 'strategic decision[s] for which the Plaintiff bears responsibility.'" *Ingle*, 439 F.3d at 198;

*Zinkand*, 478 F.3d at 637 ("If the court elects to look at additional evidence represented as

having been unavailable at the prior hearing, the court must satisfy itself as to the unavailability

of the evidence and likewise examine the justification for its omission."); *RGI, Inc. v. Unified*

45

*Indus., Inc.*, 963 F.2d 658, 662 (4th Cir.1992) (concluding that a district court can accept new evidence under Rule 59(e) as long as the party provides justification for why the evidence was not presented previously). Thus, where Plaintiff's clear error argument rests upon the presentation of evidence now that she previously possessed, but did not use due to a decision not to designate Dr. Guerette as an expert, then the Court has substantial discretion to deny the Rule 59(e) motion.

Therefore, the Court DENIES Plaintiff's Rule 59(e) motion as the Court did not commit clear error in (1) requiring expert testimony regarding the pelvic prolapse or (2) not considering the "new" evidence that could have been proffered by Dr. Guerette.

## CONCLUSION

For the reasons stated above, the Court correctly allowed Defendant to discuss the ad damnum during the liability phase, properly limited Dr. Guerette's testimony and questioned witnesses well with its authority, such that demands for a new trial are unwarranted. And even if any error did occur, it did not give rise to a miscarriage of justice, which Rule 59(a) demands. *See VS Techs., LLC v. Twitter, Inc.*, 2012 WL 1481508, at *11 (holding that the miscarriage of justice prong of a Rule 59(a) motion "requires a policy analysis under which the 'judge's unique vantage point and day-to-day experience with such matters lend expertise'") (quoting *Fairshter v. Am. Nat'l Red Cross*, 322 F. Supp. 2d 646, 650 (E.D. Va. 2004) (quotation omitted)). Additionally, the Court correctly granted Defendant's Rule 50 motion and did not commit clear error when requiring expert testimony on the issue of causation regarding Plaintiff's pelvic prolapse. Thus, the Court hereby DENIES Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter or Amend the District Court's Judgment Under Fed. R.

Civ. P. 59(e) (ECF No. 87).

Let the Clerk file this Memorandum Opinion electronically and notify all counsel of record.

An appropriate Order shall be issued.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  March 9, 2023